## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 06-152 (PLF)** |
| | : | |
| **TAJSHA WASI** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in aid of sentencing in the instant case. For the reasons set forth herein, the government respectfully recommends that the Court sentence the defendant to a period of incarceration within the Guidelines range of 108–135 months.[1]

### I.    BACKGROUND

On May 3, 2006, at approximately 7:40 p.m., Metropolitan Police Department officers executed a District of Columbia Superior Court-ordered search warrant at 3631 6th Street, Apartment 3, Southeast, Washington, D.C. Upon entering the two-bedroom apartment, the officers found the defendant, Tajsha Wasi (hereinafter "Defendant"), along with an infant and an eight-year-old child, in the apartment. At that time, Defendant was advised of her <u>Miranda</u> rights, waived them, then admitted that she was the lessee of the apartment; further, she stated that she was the only adult who lived in the apartment on a full-time basis, but she said that her boyfriend and father of her infant child, co-defendant Shane Wooden, sometimes visited the apartment.

During the search of Defendant's apartment, police located, in the living room sitting on the

---

[1] See section II.B., <u>infra</u>.

coffee table, a cigar filled with marijuana and a ziplock bag containing a small quantity of marijuana.  Further, on the floor near the living room, police found a plastic green ("Easter") egg containing 12 small ziplocks of crack cocaine.  In the hallway closet, officers recovered a shoebox containing a digital scale and a large ziplock bag containing approximately 322 grams of marijuana, as well as two Kevlar vests that were hanging in the closet.  In the apartment's kitchen, officers found a purple plastic egg containing two ziplocks of crack cocaine, another digital scale, a hot plate, several empty small ziplock bags, Inositol, and $1,115, all on the top of the kitchen cabinets. In addition, inside the kitchen cabinets, the officers recovered a .380 caliber Smith and Wesson pistol with a magazine containing .380 caliber ammunition, 14 additional small ziplocks of crack cocaine, and a sandwich-sized plastic bag containing approximately 51 grams of crack cocaine. Finally, in the freezer, inside a lockbox, police located 162 small ziplocks containing heroin, along with a women's diamond ring.

Underneath a child's bed in one of the bedrooms, officers found a coffee can containing three colored plastic egthe gs, and inside each egg, there were 15 ziplocks of crack cocaine, for a total of 45 ziplocks.  In the other bedroom, officers found 22 pills of ecstasy in three ziplock bags inside of a jewelry box that contained women's jewelry, 8 additional pills of ecstasy located in a bag, and $5,000 U.S. currency and a third digital scale located inside a safe.  Finally, in the same bedroom inside a closet that contained only women's clothing, women's shoes, and other women's personal effects, police found several hundred empty small ziplocks that matched the ziplocks in which all of the crack cocaine found throughout the apartment was contained.

All of the drugs recovered from Defendant's apartment were later sent to the Drug Enforcement Administration's chemical laboratory for analysis.  The examination revealed that a

total of 81.0 grams of cocaine base, 316.94 grams of marijuana, 15.6 grams of heroin, and 1.9 grams of ecstasy, or MDMA, were seized by police from Defendant's apartment on May 3, 2006.

Further, at trial an expert witness would have testified in essence that the quantity, weight, and packaging of the crack cocaine recovered from Defendant's apartment, particularly when considered with the drug paraphernalia, weapon and ammunition, and money also found, are consistent with possession for the purpose of distribution, rather than for personal consumption.

## II.    SENTENCING CALCULATION

### A.    Statutory Minimum/Maximum

The minimum term of incarceration for the charge of Unlawful Possession With Intent to Distribute Five Grams or More of Cocaine Base, a Class B felony, is 5 years. The maximum period of incarceration that may be imposed is 40 years. In addition, the maximum fine is $2,000,000. See Presentence Report ("PSR") at ¶¶ 59, 69.

### B.    United States Sentencing Guidelines Calculation

U.S. Probation Officer Kelli Cave, the PSR writer in this case, has calculated Defendant's total offense level to be 29 and her criminal history category to be I. PSR ¶¶ 13-23, 27. Under these calculations, Defendant's Guidelines range for a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii) is 87–108 months. See PSR ¶ 60. However, the government disagrees with the PSR writer's calculation. Specifically, as the PSR reflects, Defendant received a two-point reduction because it was determined that Defendant's role in the offense was a minor one. See PSR § 18. Yet, there is nothing contained in the facts of this case to suggest that Defendant played a minor role in the offense. Nor did the PSR writer point to any facts to support her conclusion. To the contrary, Defendant's role was significant for several reasons.

First, not only did Defendant use her apartment as a storehouse for all of the drugs that were intended to be sold as part of the drug distribution enterprise, but the drug paraphernalia found in the apartment, including the digital scales, Inositol, and empty ziplocks, indicate that the apartment was the actual location where the drugs were manufactured and packaged for sale. Second, because the entire drug distribution operation in which Defendant participated appears to have been conducted out of Defendant's residence, she clearly had full knowledge of the purpose and scope of the operation. See, e.g., United States v. Soto, 132 F.3d 56, 59 (D.C. Cir. 1997) (finding that Guidelines provision proving for downward adjustment for minor or minimal participation is appropriate for defendant who was recruited as a courier for a single drug transaction and lacked knowledge of scope of entire drug enterprise).

Third, with the exception of a portion of the money ($5,000 of $6,115) and one (of the three) digital scales that were located in a locked safe in the apartment, the drugs, the weapon, the Kevlar vests, and the paraphernalia were all located in common areas of the apartment; thus, Defendant, just like her co-defendant, was fully capable of guiding their destiny. In addition, the location of the 162 ziplocks of heroin (inside the freezer in a lockbox along with a women's diamond ring), MDMA (inside a woman's jewelry box in Defendant's bedroom), and numerous empty ziplock bags (in Defendant's bedroom, inside a closet that was filled with women's clothes, shoes, and other personal effects) that matched the ziplocks bags in which the crack cocaine was packaged, reflect that Defendant had exclusive dominion and control over these particular items. Moreover, the fact that the empty ziplocks were found in what appears to be Defendant's bedroom closet strongly suggests that she personally packaged the crack cocaine in the apartment.

Lastly, even if Defendant's role was lesser than that of her co-defendant, such circumstance

does not, by itself, warrant a downward adjustment under USSG § 3B1.2(b).  See United States v. Gaviria, 116 F.3d 1498, 1520 (D.C. Cir. 1997) ("[A] defendant is not entitled to a reduction . . . simply because he is the least culpable among several participants in a jointly undertaken criminal enterprise[;] even the 'least culpable' participants in [a] conspiracy – although they might not have played the roles of organizers or supervisors within the chain of command – nevertheless [may be deemed] active participants and [are] equally culpable vis-a-vis each other." ) (internal citation omitted); see also United States v. Caballero, 936 F.2d 1292, 1299 (D.C. Cir. 1991) (recognizing that a drug courier can play as active and culpable a role in a drug offense as another participant, even if that participant is not another courier).

The facts and circumstances of this case clearly indicate that Defendant played an integral role in the facilitation of the offense.  Because there is no evidence to suggest that Defendant's participation in the offense was a minor one, such a conclusion is, at best, speculative.[2]  Therefore, Defendant should not receive a two-point reduction for being a minor participant in the offense under USSG § 3B1.2(b).  Consequently, Defendant's total offense level should be 31, and her Guidelines range for a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii) should therefore be 108–135 months.

C.     The Impact of Booker

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the mandatory

_____

[2] Indeed, selecting the co-defendant as the person who played a greater role in the drug distribution operated out of Defendant's home in this case is arbitrary.  Where, as here, two defendants are charged with (constructive) possession with intent to distribute drugs, the evidence reflects that the drugs, contraband, and weapon were found in the common areas of the apartment, and there is no evidence reflecting how the drugs arrived there, or which defendant directly distributed the drugs to others, it is simply unreasonable to conclude that one defendant's role was inferior to the that of the co-defendant.

application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004).  As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1).  Booker, 543 U.S. at 258.  However, the Court expressly refused to invalidate the Guidelines in their entirety.  To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime.  Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the Court must state in a written order of judgment and commitment the specific reason for the imposition of a sentence different from that described in the Guidelines.  See 18 U.S.C. Section 3554(c)(2).  The sentence will then be subject to review by courts of appeals for "reasonableness."  Id. at 261.

        In Booker's wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines.  See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing).  "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker at 262 (citing 18 U.S.C. Sections 3553(a)(4)&(5) (Supp. 2004)).  In light of this mandate – and the continued requirement of written explanations for sentences that fall outside of the range called for by the Guidelines and the new standard of "reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is reasonable per se.  Not only is a sentence within the Guideline range reasonable per se, but it also accommodates the goal, endorsed by both

Congress and the Supreme Court, of meting out fair and uniform sentences.

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court.  Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history.  See, e.g., id. at 253 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 250 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction.") (emphasis supplied); id. at 292 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 304-05 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").

Since the Guidelines currently represent the only existing benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guideline range sentences are currently the only mechanism available to implement Congress' basic statutory goals.   This is so, said the court in United States v. Wilson, 350 F. Supp.2d 910 (D. Utah 2005) – the day after Booker was decided – because the Guidelines represent the product of an expert commission, that has studied the sentencing process at great length, under the specific mandate of Congress, to fashion recommended sentences that carry out the purposes defined by Congress.  The resulting Guidelines, Wilson held, plainly reflect the public's will, as

7

expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to congressional preference. Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." Id. at 950. A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent – in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants.

In this case, as explained further in section III below, no unusual circumstances exist that warrant an exception to the preference for Guidelines sentencing in this case.

## III.    DEFENDANT SHOULD BE SENTENCED WITHIN THE APPLICABLE GUIDELINES RANGE OF 108-135 MONTHS

The government recommends that the Court sentence Defendant within the Guidelines range of 108-135 months. Such a sentence would not only be presumptively reasonable, for the reasons outlined in section II.C. above, but would also be justified by consideration of the sentencing factors enumerated in 18 U.S.C. § 3553. Those factors fall into three main categories: the nature of the offense, the needs of the public, and the history and characteristics of the defendant. United States v. Ranum, 353 F. Supp.2d 984, 989 (E.D. Wis. 2005).

Defendant's illegal conduct is extremely serious and represents a real and present danger to the community. In this case, within her own home (which, as discussed below, she shared with two small children), Defendant possessed not only a significant quantity of crack cocaine, but also

8

substantial quantities of heroin, marijuana, and MDMA, which amounts also strongly demonstrate the intent to distribute rather than for personal use. In addition, Defendant possessed a loaded .380 caliber handgun and two Kevlar vests. Considering that drugs and drug-related gun violence are the source of the vast majority of crimes in this city and of violence against its citizens, Defendant's conduct here is reprehensible, and her punishment should communicate to Defendant in particular, and the community in general, that drug trafficking, especially while armed, will not be tolerated. A Guidelines sentence would certainly reflect the seriousness of defendant's overall conduct and take into account the destructive effect of her conduct on the community.

Furthermore, defendant's conduct created a substantial risk of danger to others living in her own home, namely, the two small children found in her apartment at the time of her arrest, including an 8-year old and her newborn infant. As discussed above, all of the drugs and the gun were located in common areas of the residence, where everyone who lived there, including the children, had access. Indeed, a substantial amount of the crack cocaine found inside the apartment were contained in brightly-colored plastic "Easter" eggs, which are undoubtedly enticing to children once they see them. One of these eggs, which contained 12 ziplocks of crack, was found on the floor in the living room area, and three additional plastic eggs, each of which contained 15 ziplocks of crack, were found underneath a child's bed. Also, the loaded handgun was located in the cabinet just above the stove, easily within a small child's reach. Sentencing Defendant within the Guidelines range would also take into account the dangerous living conditions to which she subjected these innocent children.

It should further be noted that Defendant has already received a substantial benefit as a result of the government's generous plea offer in this case. Specifically, police recovered a total of 81.0

grams of cocaine base from her apartment.  Given this amount, Defendant faced a charge of unlawful possession with intent to distribute fifty or more grams of cocaine base, in violation of 18 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii), and the statutory minimum period of incarceration for this offense is 10 years.  In light of the plea offer in this case, which exposes Defendant to a minimum period of incarceration of only 5 years, Defendant has already benefitted a great deal under the terms of the plea agreement.

In addition, Defendant has received a significant benefit for her early acceptance of responsibility.  Specifically, Defendant has received a three-point decrease in her offense level under the Guidelines.  See PSR ¶ 33.  Had the defendant not received this benefit, her Guidelines range would have been 151-188 months, rather than 108-135 months.  Thus, in light of this benefit and the generous plea agreement offered by the government, Defendant has already received all the leniency she should in this case.  Sentencing the defendant within the Guidelines range would certainly give both the government and Defendant the benefit of the bargain negotiated, as it would adequately serve the interests of the community.

## IV.    CONCLUSION

In summary, the advisory Guidelines range in this case provides for a reasonable sentence, one that takes into account the relevant sentencing factors set forth in 18 §3553(a).[3] We ask that the

---

[3] It is the government's position that 18 U.S. C. § 3553(a)(2)(1), which directs that the sentencing court consider the "the nature and circumstances of the offense and the history and characteristics of the defendant," should not be read to mean that the sentencing court should take into account all of the defendant's personal characteristics in imposing a sentence of incarceration. Congress, in enacting the Sentencing Reform Act, specifically prohibited certain personal characteristics from being considered in sentencing.  Thus, sentences cannot be based on a defendant's race, sex, national origin, creed or socioeconomic status.  See 28 U.S.C §944(d).  Other characteristics can be taken into account only to the extent they are relevant.  Id. Congress specifically directed that the Commission assure that the guidelines reflected "the

Court impose a sentence within the applicable Guidelines range of 108-135 months' incarceration,

and a term of supervised release as provided by statute.

Respectfully,

JEFFREY A. TAYLOR
United States Attorney

/s/

_____

By:   Donnell W. Turner
Assistant United States Attorney
Maryland Bar
Federal Major Crimes Section
555 4th Street, N.W.  #4235
Washington, DC 20001
Tel. (202) 305-1419
Fax (202) 514-6010

---

general inappropriateness" of considering certain factors, including the defendant's family ties and responsibilities, and community ties, in recommending terms of imprisonment.  28 U.S.C. § 944(e).

Thus while Congress contemplated that a defendant's age, family ties and responsibilities, community ties and similar factors may be appropriately considered with respects to incidents of sentencing other than incarceration, for example, the length and type of community service, the amount of a fine, or the conditions of probation, it recognized that these same factors have no place in determining whether and for how long a defendant should be imprisoned.  We recognize that post-Booker, the Sentencing Guidelines are advisory. Nevertheless, the Guideline provisions with respect to limitations of factors to be considered in imposing sentence clearly reflect the will on Congress on this issue, see 28 U.S.C. § 944(e), therefore, we respectfully ask that these factors be given appropriate consideration by the Court.

11