**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 06-152 (PLF) |
| | ) | |
| TAJSHA WASI, | ) | |
| Defendant. | ) | |
| _____ | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Tajsha Wasi, by her attorney, David W. Bos, Assistant Federal Public Defender, hereby submits the following memorandum in aid of sentencing in this matter. For the reason outlined in more detail below, Ms. Wasi respectfully requests that the Court sentence Ms. Wasi to a period of sixty months incarceration, followed by a four year term of supervised release. In support of this request, counsel states:

1. Ms. Wasi appears before the Court for sentencing after having pled guilty to one count of possession with the Intent to Distribute 5 Grams or More of Cocaine Base, in violation of 21 U.S.C. §841(b)(1)(B)(iii).

2. Ms. Wasi was arrested in connection with the instant offense on May 3, 2006, when officers of the Metropolitan Police Department executed a warrant to search her apartment, and found an assortment of narcotics, including 81 grams of "crack" cocaine. The officers obtained the search warrant after a police-informant purchased narcotics from Ms. Wasi' co-defendant and then boy-friend of six years, Shane Wooten, while inside Ms. Wasi' apartment. Ms. Wasi was not present when the sale occurred, and according to Det. William Witkowski at the time of the arrest the police had no reason to believe Ms. Wasi was actively involved in Mr. Wooten's drug distribution

activities.

3. Ms. Wasi appears before the Court as a Criminal History I offender. Using the "crack" cocaine guideline, the Probation Department has concluded that Ms. Wasi' Total Offense Level is 29, resulting in a sentencing guideline range of 87-108 months.

Ms. Wasi, however, objects to the Probation Department's use of the "crack" cocaine guideline, and instead urges the Court to use "powder" cocaine guideline in calculating the offense level in this case. Using the "powder" cocaine guideline (applying a 1:1 ratio) results in a Total Offense Level of 13, and a sentencing guideline range of 12-18 months. Because the guideline range proposed by Ms. Wasi is significantly below the mandatory minimum sentence the Court is required to impose in this case, Ms. Wasi urges the Court to impose the mandatory minimum sentence in this case, 60 months incarceration.

## DISCUSSION

## I.     THE POST __BOOKER__ SENTENCING FRAMEWORK

Under Justice Breyer's majority opinion in Booker, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. See 18 U.S.C. § 3553(a)(4)." United States v. Booker, __ U.S. __, 2005 WL 50108,*27 & n.1 (U.S. Jan. 12, 2005) (Breyer, J.). While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the remedial majority in Booker held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Among the matters that §3553(a) requires the sentencing judge to consider are:

(4) the kinds of sentence and the sentencing range established for--
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

2

(I) issued by the Sentencing Commission ....
(5) any pertinent policy statement--
(A) issued by the Sentencing Commission ....
18 U.S.C. § 3553(a)(4), (5).

Pursuant to Booker, therefore, courts must treat the Guidelines as but one, among several, sentencing factors.

Pursuant to 18 U.S.C. §§ 3562 and 3553(a)–which were explicitly endorsed by the Supreme Court in Booker–sentencing courts should consider the need for the sentence imposed

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth above.

Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged.

Pursuant to 18 U.S.C. § 3661, also expressly endorsed by the Booker majority:

No limitation shall be placed on the information concerning the background, character,

3

and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence.

Section 3582 of Title 18 states that

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Taken together, the directives of <u>Booker</u>, as well as Sections 3553, 3661, and 3582 of Title 18, make it clear that sentencing courts may no longer consider the Guidelines alone in determining the appropriate sentence. With respect to *departures* from the Guideline range, in particular following <u>Booker</u>, courts need not justify sentences outside the Guidelines by citing factors that take the case outside the "heartland." Rather, as long as the sentence imposed is reasonable and supported by the factors outlined in Section 3553, courts may disagree with the range proposed by the Guidelines in individual cases and exercise their discretion.

_____With regard to appropriate methodology in determining the appropriate sentence post-<u>Booker</u>, the Defendant urges the Court to adopt the approach delineated by District Court Judge Adelman in <u>United States v. Smith</u>, Case No. 02-CR-163. First, the Court must determine the applicable advisory guideline range. Second, the Court must determine whether, pursuant to the Sentencing Commission's Policy Statements, any departures from the advisory guideline range apply. Finally, the Court must determine the appropriate sentence in light of the factors set forth in 18 U.S.C. §3553(a).

<u>Advisory Guideline Range</u>

The Probation Department has concluded that the Adjusted Offense Level in Ms. Wasi' case

is 29 and that Ms. Wasi's Criminal History Category is I, resulting in an advisory sentencing range for imprisonment of 87 to 108 months. The Defendant, however, disputes the computation of Offense Level. As discussed in more detail below, the correct Offense Level in this case is 13, based on the Defendant's acknowledgment of having possessed 81 grams of crack cocaine, resulting in an advisory sentencing range for imprisonment in this case is 12 to 18 months.

## A. Offense Level Computation

Ms. Wasi acknowledged at the time of her plea that she possessed 81.3 grams of cocaine base. Under U.S.S.G. §2D1.1, therefore, the Probation Department has concluded Ms. Wasi' Base Offense Level is 32. The Probation Department has increased MS. Wasi' offense level by two points because a firearm was recovered during the search. The Probation Department has decreased Ms. Wasi' offense level by two points, finding that Ms. Wasi' role in the offense is "minor." With a three-level adjustment for acceptance of responsibility pursuant to U.S.S.G.§3E1.1(b), the Probation Department has concluded that the total offense level is 29.

For the reasons outlined below, the Defendant objects to the Probation Department's use of the offense level for cocaine base (32) as opposed to the offense level for powder cocaine (16).

### Powder vs. Crack Cocaine Disparity

Defendant submits that the Court should not use crack cocaine guideline, but instead use the powder cocaine guideline to determine her Base Offense Level because the disparity between sentences for powder and crack cocaine is unwarranted. This argument is based primarily upon the Sentencing Commission's own disavowal of the basis for the disparity. The Commission has issued several reports concluding just that.

### 1. The 1995 Report

5

In February 1995, the Commission issued the first report, <u>Special Report to the Congress: Cocaine and Federal Sentencing Policy</u> (Feb. 1995) ("1995 Report"). The Report repudiated the still-existing crack sentencing structure.

The 1995 Report is a comprehensive study which analyzes and considers the appropriate level of punishment to be imposed for crack offenses by the very agency charged by Congress to make sentencing determinations and recommendations. <u>See</u> 28 U.S.C. § 994. The report analyzes each factor perceived to be relevant to the distinction between crack and powder cocaine. Many of the factors were found to provide no support for a higher penalty for crack. Of "[t]he factors that suggest a difference between the two forms of cocaine," however, the Report concludes that they "do not approach the level of a 100-to-1 quantity ratio." 1995 Report at xiv.

Analyzing information not considered at the time the existing ratio was adopted, the Commission found that the 100-to-1 penalty ratio (I) cannot be justified by the physiological effects of the two forms of cocaine, 1995 Report at 182-83; (ii) has a disparate impact on blacks (in the last fiscal year for which data was available, 88.3% of crack defendants were black, 7.1% were Hispanic, and only 4.1% were white), Crack Report at 161, Table 13; (iii) creates higher penalties for street dealers than for their more culpable supplier, Crack Report at 174; (iv) effects a double punishment on crack defendants in light of subsequent guideline changes, 1995 Report at xv; and (v) creates extraordinary disparities given the street values of the two forms of cocaine.[1] 1995 Report at 173, Table 19.

The 1995 Report concludes that the 100:1 ratio should be eliminated and replaced with

---

[1] For example, at offense level 18, the street value of cocaine base was $115. The street value of powder cocaine at the same offense level was $10,700. 1995 Report at 173, Table 19.

specific sentence enhancements more closely tailored to the supportable harm associated with some

crack cocaine offenses.  The Report states:

> The Sentencing Commission shares congressional and
> public concern about the harms associated with crack cocaine    - - both to
> users and to the society as a whole - - including the violence associated
> with its distribution, its use by juveniles, the involvement of women and
> juveniles in its distribution, and its addictive potential.  However, the
> Sentencing Commission concludes that Congress's objectives with regard
> to punishing crack cocaine trafficking can be achieved more effectively
> without relying on the current federal sentencing scheme for crack cocaine
> offenses that includes the 100-to-1 quantity ratio.

1995 Report at xiv.

By subsequently promulgating proposed amendments to the crack guidelines, the

Commission acknowledged that it had not adequately considered factors bearing on the 100:1

sentencing disparity between crack and powder cocaine before enacting the guidelines presently

in effect and in light of changes to other guidelines specifically addressing harms associated with

some crack offenses.  In short, "the Commission concluded that sufficient policy bases for the

current penalty differential do not exist."

With respect to the crack cocaine guidelines, the 1995 Report demonstrated that the

Commission by its own admission overlooked a number of factors which are relevant to the

statutorily-defined sentencing purposes.  The Commission acknowledged this in the 1995 Report

and in its submission to Congress of a guidelines amendment proposing the equalization of the

crack/powder cocaine penalties.  60. Fed. Reg. 25, 074 (May 10, 1995).  The Commission

admitted that its guidelines for crack cocaine offenses fail to consider "characteristics of the

offense and the offender" other than "the quantity and form of cocaine."  1995 Report at I.  "In a

given case," other characteristics "can be equally or more important" to the determination of the

"appropriate punishment." Id.

Among the factors that the Commission stated that it had not adequately considered are: (1) the geographic range of a defendant's illegal activity; (2) the profit to be reaped by a defendant; (3) a defendant's role as a retail street dealer rather than a wholesale distributor; (4) the lack of violence associated with the offense; (5) the absence of a weapon; (6) the flattening and inversion of penalties vis a vis cocaine suppliers; (7) the absence of juveniles in the offense; and (8) the lack of psychopharmacologically induced crime. 1995 Report at 168-175; 193-197. Some of these factors were not adequately considered because they are subsumed in the current ratio although they may not be present in most cases or in a given case; other factors, when present in a case, are being doubly punished because of separate enhancements for the factor. Id. at 193-197.

The 1995 Report had also noted that there was some evidence suggesting that more violence was associated with trafficking and use of crack cocaine than with powder cocaine but that the evidence did not suggest that the increased level of violence "justifies a ratio as large as 100-to-1." 1995 Report at 197. Indeed, the data demonstrated that the form of cocaine involved in an offense is not as accurate an index of a defendant's dangerousness or propensity for violence as are the guideline enhancements expressly designed by the Commission to capture such characteristics. Id. at 166. Significantly, separate guideline enhancements did not exist when Congress first enacted mandatory minimums in 1986. "[T]o the extent that the guidelines now provide a punishment for some of those same factors subsumed in the ratio, those factors generate an enhancement both through an increased ratio differential and through guideline adjustments. In short, [crack cocaine defendants] are doubly punished through the interplay of

8

the two structures." Id. at 196.  The Commission concluded that the use of enhancements based on injury to victims, violence, possession of a weapon, and the like is a "distinctly fairer" approach than a penalty scheme that "relies exclusively or primarily on a quantity ratio to distinguish among offenders warranting greater punishment . . . " Id. at 199.  The Commission acknowledged that the crack guidelines do not promote 'fairness' or 'just punishment' "because they punish less culpable crack dealers more severely than more culpable cocaine dealers and suppliers" and that "no policy basis for the present 100:1 sentencing differential exists".

As discussed above, the Commission, shortly after issuing the 1995 report, proposed a guideline that would have equalized the amounts of crack and powder under the guidelines. Congress voted to disapprove this amendment, but directed the Commission to further study the matter.

    **2.**    **The 1997 Report**

In April 1997, the Commission issued its second report, Special Report to the Congress: Cocaine and Federal Sentencing Policy (April 1997) ("1997 Report").  This 1997 Report also concluded that the crack/powder sentencing disparity was unwarranted.

In the 1997 Report the Commission carefully considered each factor listed in the congressional directive and evaluated current federal cocaine sentencing policy in relation to congressional goals for drug offense sentencing.  The goals suggested that those who traffic in either powder or crack cocaine should be sentenced severely but that the current penalty differential between powder and crack cocaine sentencing must be reduced.  See 1997 Cocaine Report at 3.  The Commission concluded that the five-gram trigger for crack cocaine is "over inclusive" because it is indicative of a retail or street-level dealer rather than a mid-level or

9

serious drug trafficker.  Id. at 5.  It further noted that if a street-level seller possessed a gun or engaged in violence in connection with such a sale, a sufficiently severe sentence could be imposed by virtue of specific guideline enhancements; but the five-year mandatory minimum penalty should not be triggered by such a small quantity.  See id.  at 506.  The Commission also found that by 1997 nearly 90 percent of those convicted in federal courts for crack cocaine distribution were African Americans, while the majority of crack cocaine users were White.  See id. at 8.  As a result, the sentences are "harsher and more severe for racial the minorities than others," and the current penalty structure "results in a perception of unfairness and inconsistency."  Id.

     After reviewing all the data related to the stated congressional goals for federal drug policy, the Commission again concluded that Congress' objectives can be "achieved more effectively without relying on the current federal sentencing scheme for cocaine offenses that includes the 100-to-1 quantity ratio."  1997 Cocaine Report at 9.  It unanimously reiterated its original core finding that, although research and public policy may support somewhat higher penalties for crack cocaine than for powder cocaine, a 100-to-1 quantity ratio simply "cannot be justified."  Id. at 2.  In coming to this conclusion, the Commission balanced the conflicting goals of congressional and public concern about the harms associated with both forms of cocaine - including the potential violence associated with its distribution in some cases, its use by juveniles, the involvement of juveniles in its distribution, and it addictive potential.  See id. at 9. The Commission again recommended that Congress revise the federal statutory scheme for crack and powder cocaine offenses because hundreds of people continue to be sentenced under an unfair law.  See id. at 8-9.

3.      **The 2002 Commission Report**

The Sentencing Commission recently issued a new <u>Report to the Congress: Cocaine and Federal Sentencing Policy</u> (May 2002) ("2002 Report").  In it, the "Commission again unanimously and firmly concludes that the various Congressional objectives can be achieved more effectively by decreasing substantially the 100-to-1 drug quantity ratio."  <u>Id</u>. at viii.  In reaching this conclusion, the Commission debunked a number of myths upon which the original disparity was apparently based.  The Commission made four main findings.  First, it found the current penalties exaggerate the relative harmfulness of crack cocaine.  Second, the current penalties sweep too broadly and apply most often to lower level offenders.  Third, the current quantity-based drug sentencing system overstates the seriousness of most crack offenses and fails to provide adequate proportionality.  Fourth, the Commission concluded that the severity of the current penalties mostly impacts minorities.  <u>Id</u>. at v-viii.  The Commission proposed a model guideline amendment to remedy the problems with extensive modifications.  <u>Id</u>. at A-1 to A-10.

With respect to race, the Commission stated:

> The overwhelming majority of offenders subject to the heightened crack cocaine penalties are black, about 85 percent in 2000 (*see* Chapters 5 and 8).  This has contributed to a widely held perception that the current penalty structure promotes unwarranted disparity based on race.  Although this assertion cannot be scientifically evaluated, the Commission finds even the perception of racial disparity problematic because it fosters disrespect for and lack of confidence in the criminal justice system.  Moreover, to the extent that the 100-to-1 drug quantity ratio is shown to result in unduly severe penalties for most crack cocaine offenders, the impact of the severity falls primarily upon black offenders.

<u>Id</u>. at viii.  The Commission further stated:

> One of the key issues surrounding the debate concerning the different penalty structures for crack cocaine offenses and powder cocaine offenses

11

relates to the racial composition of federal crack cocaine offenders. The overwhelming majority of offenders subject to the heightened crack cocaine penalties are black, about 85 percent in 2000. This has contributed to a widely-held perception that the current penalty structure for federal cocaine offenses promotes unwarranted disparity based on race.

In order to evaluate whether the crack cocaine penalties disproportionately impact blacks, data regarding the racial composition of the entire population of crack cocaine traffickers would be required. For example, if 85 percent of federally convicted and sentenced crack cocaine traffickers are black, the fact that the same percentage of all crack cocaine traffickers are black would tend to undermine the assertion of unwarranted disparity based on race. On the other hand, if 85 percent of federally convicted and sentenced crack cocaine traffickers are black, the fact that some lower percentage of all crack cocaine traffickers are black would tend to support the assertion of unwarranted disparity based on race. Although data regarding the racial composition of crack cocaine users are available, such data do not exist for crack cocaine traffickers generally. As a result, this assertion cannot be evaluated scientifically.

Nevertheless, the Commission finds even the perception of racial disparity to be problematic. Perceived improper racial disparity fosters disrespect for and lack of confidence in the criminal justice system among those very groups that Congress intended would benefit from the heightened penalties for crack cocaine.

* * *

The fact that those same communities and many of their representatives now seek change in the federal cocaine penalty structure suggests a critical re-examination of the current penalty structure may be warranted.

Furthermore, to the extent that the preceding analysis has shown that the 100-to-1 drug quantity ratio results in unduly severe penalties for most crack cocaine offenders, the effects of the severity fall primarily upon black offenders.

Id. at 102-103.

### 4.    The 2004 Assessment

Even more recently, in its report, Fifteen Years of Guidelines Sentencing: An Assessment

of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform

(November 2004) ("Assessment"), the Commission again criticized the harsher penalties for

crack.  The Assessment again noted the stark racial impact of this disparity:

> In 2002, 81 percent of the offenders sentenced for trafficking the crack form of cocaine were African-American.  The average length of imprisonment of crack cocaine was 119 months, compared to 78 months for the powder form of the drug.  Average sentences for crack cocaine were 25 months longer than for methamphetamine and 81 months longer than for heroin.

Id. at 131 (footnotes omitted).

The Assessment further noted that:

> The Commission has previously reported that the harms associated with crack cocaine do not justify its substantially harsher treatment compared to powder cocaine.
>
> . . .
>
> For these and other reasons, the Commission has repeatedly recommended that the quantity thresholds for crack cocaine be revised upward.  In 2001 (USSC, 2001) the Commission recommended that the crack threshold be raised to at least 25 grams from 5 grams, replacing the current 100-to-1 ratio with a 20-to-1 ratio.

Id. at 132.  The Assessment concluded that:

> As shown in Figure 4.10, this one change to current sentencing law would reduce the gap in average prison sentences between Black and White offenders by 9.2 months.  Among drug trafficking offenders only, the current gap is even wider -- 92.1 months for Blacks compared to 57.9 months for Whites -- and the reduction would be even greater, 17.8 months.  This one sentencing rule contributes more to the differences in average sentences between African-American and White offenders than any possible effect of discrimination.  Revising the crack cocaine thresholds would better reduce the gap than any other single policy change, and it would dramatically improve the fairness of the federal sentencing system.

13

Id. (emphasis added).

###     5.     Cases

The D.C. Circuit rejected the argument that a downward departure under the then-

mandatory guidelines was permissible because of the unwarranted crack/powder sentencing

disparity.  See United States v. Anderson, 82 F.3d 436 (D.C. Cir. 1996).  In Anderson, the

defendant relied heavily upon the 1995 report to argue that such a departure was warranted.  The

court in Anderson, however, relied primarily upon the fact that the 1995 Report was not assigned

official status under 18 U.S.C. § 3553(b), and thus the 1995 Report had essentially no bearing in

departure analysis under the mandatory guidelines system.  Id. at 440-41.

Notably, however, the majority in Anderson declined to address an argument that the

disparity violated § 3553(a)'s requirements, claiming the defendant had not raised the issue.  Id.

at 441.  The court noted that § 3553(a) had to be read in light of the express requirements of §

3553(b).  Id.

In dissent in Anderson, Judge Wald focused on § 3553(a):

> The majority's analysis is flawed because it stops short of asking the
> critical question: whether these cases fit into that very narrow category of
> circumstances where a policy statement or official commentary is not
> binding upon a sentencing court because it violates constitutional or
> statutory dictates.  In light of the findings in the Special Report, it seems to
> me that applying the atypicality requirement to deny departure authority
> would violate a federal statute - - the Sentencing Reform Act itself.
> Section 3553(a) of the Sentencing Reform Act sets forth the factors a court
> must consider when sentencing under the guidelines, directing courts to
> impose a sentence which is "sufficient, but not greater than necessary" to
> achieve the goals of sentencing.

. . .

In usual cases, it is reasonably assumed that the Commission's guidelines adequately reflect these purposes.  But that assumption falls apart in the exceptional situation where the Commission itself admits that its guidelines do not accomplish the four purposes of § 3553(a).  To blindly adhere to the atypicality requirement even if doing so would plainly violate the mandates of § 3553(a) is to give no meaning at all to that provision - - an interpretation which would be at odds with basic tenets of statutory construction.

. . .

The nub of the problem here, of course, is that the *Special Report* is a startlingly forthright admission by the Sentencing Commission that its crack guidelines violate § 3553(a)'s instructions that a court impose a sentence "sufficient, but not greater than necessary" to "reflect the seriousness of the offenses" and "provide just punishment."

. . .

The[ ] acknowledgments by the Commission itself - - that crack sentences raise "[i]ssues of 'fairness' or 'just punishment'" because they punish less culpable crack dealers far more severely than more culpable cocaine dealers and suppliers, and that no policy basis for the present 100:1 sentencing differential exists - - make it impossible to square the crack guidelines with the sentencing purposes of § 3553(a).  For this reason, I believe a district court is authorized to disregard the atypicality requirement and, though it should proceed cautiously in this largely unchartered terrain, to grant a departure if it determines that application of the crack guidelines to the case it before it will, in fact, plainly violate § 3553.

Id. at 446-48 (Wald, J., dissenting).

In In re Sealed Case, 292 F.3d 913 (D.C. Cir. 2002), defendant argued that the Supreme

Court's decision in Koon v. United States, 518 U.S. 81 (1996), had overruled Anderson.  The

court, however, continued to adhere to the heartland analysis of § 3553(b), and relying upon

Anderson, reaffirmed its decision that a departure for the crack/powder disparity could be

15

imposed.

The decision in Booker has eviscerated the rationale for the holdings in Anderson and In re Sealed Case.   The Supreme Court in Booker excised § 3553(b)(1), the provision upon which the majority in Anderson relied for its decision, and made the guidelines advisory and a factor to be considered along with all the other factors set forth in § 3553(a).  Thus, Judge Wald's dissent in Anderson now directly addresses the issue before this court.  She cogently points out how the unwarranted crack/powder disparity violates § 3553(a)'s provisions.

Moreover, the current basis for the disparate treatment of crack and powder sentences, unfortunately, was permeated with racial considerations, reflected in Congress's disapproval in 1995 of the Commission's amendment that would have equalized the treatment of the two substances.  The rejected amendment would have abolished the 100:1 ratio between crack and powder while creating or enhancing adjustments for violence and the use of minors in connection with drug trafficking offenses.

The members of Congress who voted to reject the equalization of the cocaine penalties repeatedly and unanimously explained their position in terms of their desire to protect African-Americans and other minorities living in inner city neighborhoods from the harm caused by the use and distribution of crack cocaine.  The record of the Congressional debate of October 18, 1995, in which the House adopted the bill rejecting the equalization amendment that had already been adopted by the Senate, prominently reflects this motivation.  See 104 Cong. Rec. H10256-10283 (daily ed. Oct. 18, 1995).

The comments of Representative Shaw are representative of

16

the record:

Mr. SHAW.

Mr. Speaker, I thank the gentlewoman for yielding me this time. I was sitting in my office and listening to some of the debate. The gentleman from South Carolina was speaking as I walked out the door, and the
suggestions were being made that there was some racist motivation behind the question of minimum mandatory sentencing for crack cocaine and possession thereof. And also the question was raised as to how did this ever get into the law.

Well, Mr. Speaker, I want to tell the gentleman how it got into the law. It was an amendment I put into the law, and I put it in when I was on the Judiciary Committee. At that time I felt that it was a very important provision to be in the law. There was no racist motivation whatsoever in putting that in the law.

It was about in 1986, right about then. I was on the Judiciary Committee. Crack cocaine was almost a recent phenomenon, but it was growing like Topsy. This was something back in 1981 or 1980, back when I was mayor of Fort Lauderdale, when a crack was a thing in the sidewalk. We knew nothing about crack cocaine. This came in the early 1980's, and we found the instant addictive nature of this substance was absolutely debilitating.

We also found that where it was being used most, and where it was creating its worst problems were in minority areas because of the cheapness of it. We found this was an area that was being unfairly, unconscionably impacted by cocaine, crack cocaine, as it is even today.

So I would say to the gentleman from South Carolina that it was because of concern for what this was doing in minority neighborhoods, how it was tearing up these neighborhoods, and it has. The gentleman well knows this from his own background. The problem that we have in the inner cities, particularly in minority areas right now, the crime and all of this, is that the drug problem in this country has absolutely torn these neighborhoods apart.

What did it seem to be the best thing to do? The best thing to do was to go after the dealers. We set quantities we felt that would

17

> qualify people as dealers, not users but dealers, people who were
> going in and exploiting the poor people and stealing their lives and
> their future by selling them crack cocaine.
>
> There was no racist motivation at all. As a matter of fact, it was a
> question of trying to save the minority neighborhoods from this
> awful curse that had gone all across this country, and it is not only
> confined in the minority areas. I will not suggest that. But it
> seemed that was where it was having its biggest impact, and this is
> where we had to go after the problem, and this is why we did it.

Id. at H10,260. Other members of the House who took part in the debate expressed similar

sentiments.

Thus, faced with the Sentencing Commission's report that the sentencing distinction

between powder and crack cocaine was irrational, and that its starkly disproportionate racial

impact on African-American defendants was unwarranted, Congress decided to say the policy

was really to protect and benefit African-Americans.

Echoing the sentiments of Congress, in United States v. Thompson, 27 F.3d 671, 678 n.3

(D.C. Cir. 1994), the D.C. Circuit took the view that "the severe penalties for crack offenses

actually help rather than hurt law-abiding African-Americans," because it seemed "likely that the

harmful effects of the crack trade are concentrated in the black community." (Emphasis in

original). The latter part of this statement has been discredited as a premise by the Commission's

reports. The former part of the statement, while inexplicable, if it was a motive for the disparity

would render it unconstitutional. See Shaw v. Hunt, 517 U.S. 899, 908 (1996).

In Shaw v. Hunt, the Supreme Court made clear that the use of race as a basis for

government action, even when intended to "benefit" or "protect" minorities, must be strictly

scrutinized and will be held unconstitutional unless the government can show that it is pursuing a

"compelling state interest" and its actions are "narrowly framed to accomplish that purpose." Id.

at 907-908 (invalidating gerry-mandered voting district which was intended to create a district

where African-Americans were the majority in an attempt to help the black citizens of the gerry-

mandered district elect representatives of their own race.)

> Racial classifications are antithetical to the Fourteenth
> Amendment, whose "central purpose" was "to eliminate racial
> discrimination emanating from official sources in the States." The
> Framers of the Fourteenth Amendment ... desired to place clear
> limits on the States' use of race as a criterion for legislative action,
> and to have the federal courts enforce those limitations. While
> appreciating that a racial classification causes "fundamental injury"
> to the "individual rights of a person", we have recognized that,
> under certain circumstances, drawing racial distinctions is
> permissible where a governmental body is pursuing a "compelling
> state interest." A State, however, is constrained in how it may
> pursue that end: "The means chosen to accomplish the State's
> asserted purpose must be specifically and narrowly framed to
> accomplish that purpose." North Carolina, therefore, must show
> not only that its redistricting plan was in pursuit of a compelling
> state interest, but also that "its districting legislation is narrowly
> tailored to achieve [that] compelling interest."

Id. (citations omitted). The Court has recently reaffirmed that "benign" racial classifications are

just as suspect as any other racial classification. Johnson v. California, 2005 WL 415281 at *5

(Sup. Ct. February 23, 2005).

Indeed, the premise of the Congressional action and the Circuit's footnote in Thompson

is that it benefits African-Americans to imprison disproportionate numbers of them for extremely

lengthy periods of time based on an irrational and discredited distinction. In the 2002 Report at

103, the Commission found that the "legislative history surrounding the 1986 Act indicates that

one of Congress's primary concerns was to protect poor and minority neighborhoods that were

most afflicted by crack cocaine trafficking and its associated secondary harms." Such "benign"

19

treatment is aptly described:

> Of all tyrannies a tyranny sincerely exercised for the good of its victims
> may be the most oppressive . . . .[T]hose who torment us for our own good
> will torment us without end for they do so with the approval of their own
> conscience.

Lewis, The Humanitarian Theory of Punishment, 6 Res Judicatae 224, 228 (1952).  Surely, if it is

unconstitutional to benignly benefit African-Americans by creating voting districts to attempt to

allow African-Americans to be elected to public office, it is unconstitutional to benefit African-

Americans by imprisoning them in vastly disproportionate numbers for irrational and discredited

reasons.

Although the criminalization of drug trafficking offenses may be considered a compelling

state interest, it is clear that the penalties for cocaine base enacted by Congress have not been

"narrowly tailored to achieve that compelling interest."   The 1995 Report published by the

Sentencing Commission explained the flaws in the current enhanced penalties for cocaine base

offenses.  See also D.K. Hatsukami & M.W. Fischman, "Crack Cocaine and Cocaine

Hydrochloride: Are the Differences Myth or Reality?", 276 JAMA 1531 (Nov. 20,

1996)(concluding that the current guidelines for cocaine base are excessive because the

physiological and psychoactive effects of both forms of cocaine are nearly identical); William

Spade, Jr., "Beyond the 100:1 Ratio: Towards A Rational Cocaine Sentencing Policy", 38

Ariz.L.Rev. 1233, 1271 (1996)(arguing that 100:1 ratio "is not achieving its stated purpose of

incarcerating major drug traffickers").  For that reason, the Sentencing Commission proposed an

amendment that was more narrowly tailored to meet the perceived harms of cocaine base.  The

proposed amendment would have increased the penalties for violence associated with cocaine

base trafficking and other of the perceived harms while equalizing penalties for those offenses

that did not involve such aggravating factors.  The guideline proposed by the Sentencing

Commission but rejected by Congress is more "narrowly tailored" than the present guideline.

The current guideline, which remains in place primarily because of Congress' race-conscious

benign consideration of the effects of crack cocaine distribution is not "narrowly tailored".  It

should, therefore, not survive strict scrutiny by this Court.  Indeed, in the 2002 Report, the

Commission has recommended an extensive amendment to the guideline which demonstrates

that it is possible to "narrowly tailor" the sentencing scheme, and that Congress has not done so.

In Reno v. Bossier Parish School Board, 520 U.S. 471, 488    (1997), the Court

reaffirmed that the appropriate analysis for equal protection claims is set forth in Arlington

Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977).  In Bossier Parish

the Court stated:

> the impact of an official action is often probative of why the action
> was taken in the first place since people usually intend the natural
> consequences of their actions.

520 U.S. at 487.  The Court also reviewed the factors set forth in Arlington Heights:

> The "important starting point" for assessing discriminatory
> intent under Arlington Heights is the "impact of the official action
> whether it 'bears more heavily on one race than another'."  429 U.S.
> at 266, 97 S.Ct., at 564 (citing Washington v. Davis, 426 U.S. 229,
> 242, 96 S.Ct. 2040, 2048-2049, 48 L.Ed. 2d 597 (1976). . .  Other
> considerations relevant to the purpose inquiry include, among other
> things, "the historical background of the [jurisdiction's] decision'"
> "[t]he specific sequence of events leading up to the challenged
> decision'" "[d]epartures from the normal procedural sequence"; and
> "[t]he legislative or administrative history, especially . . . [any]
> contemporary statements by members of the decision making
> body."  Id., at 268, 97 S.Ct., at 565.

520 U.S. at 489.

In the present case, not only are the impact and natural consequences of Congress's action clearly for racial reasons, Congress specifically rejected the Commission's equalizing amendment for the purpose of "benefitting" blacks.  The other factors set forth in Arlington Heights are discussed in this memorandum, and reflect the invalidity of the classification Congress has made and perpetuated.

In addition, the opinion in United States v. Holton, 116 F.3d 1536 (D.C. Cir. 1997), is inapposite to the present case.  In Holton, the court rejected an equal protection claim because the defendant had "not offered any specific evidence of disparate impact."  Id. at 1548.  In the present case, defendant has set forth such evidence.  Furthermore, Holton does not address at all the benign discrimination claim that defendant has raised.

Defendant also contends that the crack/powder disparity is invalid as purposeful discrimination against blacks.  In United States v. Johnson, 40 F.3d 436 (D.C. Cir. 1994), the court rejected an argument that the crack sentencing scheme should be subject to strict scrutiny because the disparate racial impact of the statutes and guideline had a discriminatory purpose.[2]  The court in Johnson held that the defendants had failed to show discriminatory intent on the part of Congress.  Johnson, however, was decided before the Sentencing Commission's reports were issued, and Congressional rejection of the Commission's proposed amendment equalizing the amounts of cocaine powder and crack for sentencing purposes.  The 1995 Report and recommendation, and the subsequent congressional disapproval, § 1 of the Federal Sentencing

---

[2]  The court in Johnson, 40 F.3d at 439, stated that the court in Thompson addressed only an argument that the crack sentencing scheme violated a rational basis test.

Guidelines Amendment, Disapproval Act, Pub. L. No. 104-38, 109 Stat. 334 (1995), now

demonstrate the discriminatory purpose that the court found was not shown in <u>Johnson</u>.

     The court in <u>Johnson</u> set forth the legal framework for assessing such claims:

> The Supreme Court has required that a "decision maker ... selected
> or reaffirmed a course of action at least in part 'because of,' not
> merely 'in spite of,' its adverse effect upon an identifiable group."
> <u>Personnel Adm'r of Massachusetts v. Feeney</u>, 442 U.S. 256, 279
> (1979), <u>aff'd</u>, 445 U.S. 901 (1980). Discriminatory purpose thus
> implies even more than an "awareness of consequences."  Id.
>
>     . . .
>
> When determining whether such invidious discriminatory purpose
> exists, courts may look to "the totality of the relevant facts,"
> including the disparate impact.  <u>See id</u>. at 242.  Circumstantial
> evidence of racially discriminatory legislative purpose may also
> include the historical background of the legislative scheme, the
> specific sequence of events leading up to the enactment, a
> departure from the normal procedural sequence, a substantive
> departure from a routine decision or rule, contemporary legislators'
> statements, and the "inevitability or foreseeability of the
> consequence of the law."  <u>See United States v. Clary</u>, 34 F.3d 709,
> 711 (8th Cir.1994) (<u>citing</u>  <u>Village of Arlington Heights v.
> Metropolitan Housing Dev. Corp.</u>, 429 U.S. 252, 266 (1977), <u>cert.
> denied</u>, 434 U.S. 1025 (1978)).

<u>Id</u>.  As discussed above, in the discussion regarding "benign" discrimination, in October 1995,

the Congress rejected the Commission's proposed cocaine sentencing amendment, and left intact

the current sentencing scheme, in large part precisely because of its disparate racial impact.

     In <u>Johnson</u>, 40 F.3d at 440, the court found there were only "scattered pieces of legislative

history", which were inadequate to show discriminatory purpose.  The court in <u>Johnson</u> also

found significant the fact that

> After all, the Congress of 1986 was composed of many congressmen,
> including a number of African-Americans, who could have been expected

> to attack promptly any legislation thought to stem from discriminatory
> purpose--let alone legislation accompanied by racist remarks.

Id. The Commission's 1995 Report and the Disapproval Act change not the analysis of Johnson,

but the result.

In the 1995 Report, the Commission stated:

> In 1993, Whites account for 30.08 percent of all convicted federal
> drug offenders, Blacks 33.9 percent, and Hispanics 33.8 percent.
> Sentencing patterns for some drugs show high concentrations of a
> particular racial or ethnic group. Most strikingly, crack cocaine
> offenders are 88.3 percent Black . . .[3] Powder cocaine cases involve
> sizeable proportions of Whites (32.0%), Blacks (27.4%), and
> Hispanics (39.3%).
>
> Among defendants convicted of simple possession, 58 percent of
> powder defendants were White, 26.7 percent were Black, and 15
> percent were White, 84.5 percent were Black, and 5.2 percent were
> Hispanic.

1995 Report at 156. When it submitted the cocaine equalization amendments to Congress, the

Commission reported that it

> was deeply concerned that almost ninety percent of offenders
> convicted of crack cocaine offenses in the federal courts are Black.
> The Commission concluded that it is important that sufficient
> policy bases exist to justify a penalty differential that has a severe
> impact on a particular minority group.

60 Fed. Reg.25074, 25076 (May 1, 1995). The Commission concluded that "sufficient policy

bases for the current penalty differential do not exist." 60 Fed. Reg. at 25076-77.

---

[3] The starkness of the 88.3 percent figure is underscored by the fact that in 1993 blacks constituted only 12.5 percent of the U.S. population while whites constituted 83.3 percent and in 1994 blacks constituted 12.5 percent of the U.S. population while whites constituted 83.1 percent. U.S. Dept. of Commerce, Statistical Abstract of the United States 1995, 14 Table No. 13 (Sept. 1995). McClesky v. Kemp, 481 U.S. 279, 293 (1987) ("statistical proof normally must present a "stark" pattern to be accepted as the sole proof of discriminatory intent under the Constitution").

The debate in Congress was permeated with remarks about race:

> On September 12, 1995, the Republican majority on the House Judiciary Committee had the opportunity to eliminate the disparity in sentences between crack cocaine and powder cocaine offenses. The Committee could have eliminated blatantly discriminatory federal laws. Regrettably, the majority opted instead to perpetuate these discriminatory laws by passing and reporting out H.R. 2259, which disapproves the recommendations of the U.S. Sentencing Commission to eliminate the disparities in federal sentencing for crack cocaine and powder cocaine offenses.

> In response to complaints from the federal bench, the criminal defense bar, family members of convicted crack defendants and civil rights groups, Congress directed the Sentencing Commission in the 1994 Crime Bill to examine the obvious disparity in sentences for crack and powder offenses. Overwhelming evidence was presented to support the unanimous conclusion of the Commission members that the current 100-to-1 disparity for crack trafficking versus powder trafficking offenses cannot be justified and mandatory minimum sentences for simple possession of crack must be eliminated. By rejecting the recommendation of the Sentencing Commission, the Committee majority rejected documented and analytically sound analysis in favor of an insulting paternalistic approach based on unsupported anecdotal evidence.

> . . .

> [P]unishing crack cocaine offenses more harshly than powder cocaine offenses unjustly and disproportionately penalizes African Americans.

> . . .

> Prisons are literally filled with young African-American men and women serving mandatory minimums for crack cocaine trafficking and possession offenses.

H. Rep. No. 38, 104th Cong., 1st Sess. 16, reprinted in U.S. Code Cong. and Admin. News, 335, 349 (dissenting views) (citations omitted).

I have never suggested that the motivation 10 years ago, or

whenever this was put into the law, was a racist motivation.
However, the impact of this law has been very, very, very
substantially racist in its impact. To defend a provision in the law
10 years later, based on knowledge that the gentleman did or did
not have 10 years ago, is something that I would hope that the
gentleman would not do.

141 Cong.Rec. H10,260 (Oct. 18, 1995) (Statement of Rep. Watt).

Further, let me tell my colleagues what is happening. Minorities
represented an average of 96 percent of those prosecuted for crack
cocaine nationally in Federal courts from 1992 to 1994. This is a
fairness issue, sir, and it is a race issue.

Id. at H10,261 (Statement of Rep. Waters).

Mr. Speaker, their perception is because we have a 100-to-1 ratio
in weight between rock cocaine and powder cocaine, that this is a
race issue; just because 96 percent of the people arrested under
rock cocaine are black. Imagine that.
. . .

They know and they both admit these ratios are wrong. And the
black people feel like they are being picked on. Why? I would say
to the gentleman from Florida, Mr. SHAW, because it is 10 doses
versus 5,000 doses in my white suburbia.

Mr. Speaker, I do not know why they feel they are being picked on,
just because if someone is arrested with 10 doses, they are
presumed to be a pusher and they have to have 5,000 doses of my
powder to be a pusher. They get 5 automatic years, with the judge
not able to say this guy has never been arrested before.

Id. at H10, 262 (Statement of Rep. Baker).

Mr. Speaker, it is idiotic for us to have a disparity in these
ratios for powder cocaine or crack. In fact, I would say to the
gentleman from Florida, Mr. Shaw and the gentleman from
Florida, Mr. McCollum, one has to have powder cocaine in order
to make crack cocaine.

The reality is that the people who have the powder cocaine
are directly responsible for the creation of the crack cocaine. So, if

26

one wanted to root out the evil and punish it, one would create the disparity in the reverse.

Now, what we have here is a situation where I think that most people in this country can recognize that on one hand we have most of the people arrested for crack happen to be white, but most of the people who are convicted and serving these mandatory minimums happen to be black. There is a problem right there. We have had a number of studies that show in every case the sentencing for crimes in our country is racially influenced and more severe. Every time the crime is the same, there is a differential in the sentencing. So, unfortunately it falls upon people in minority communities to bear the brunt of that.

Id. at H10,263 (Statement of Rep. Fattah).

Many Members of this body have a speech in which they talk about our efforts to fight poverty, our efforts to house people, our efforts to defeat hunger, and they say we spend all this money and it has not worked. They point to gross statistics that say, "Gee, there are still poor people, there is still bad housing." Mr. Chairman, I do not think much of that method of argumentation, but I also would expect them at least to be consistent in applying it because, if we want to look at an area where a policy that has cost an awful lot of money does not on its face appear to have worked, let us look at the policy of trying to combat drug abuse by locking up for long periods of time people who have committed no violent crime, have taken nothing from anybody by force, have struck no one, have attacked physically no one, and are at most very, very low- level, bottom-of-the-chain members of drug sales or may not be sellers at all. They may simply be users, and they may, by that, be users who share with one or two other people.

Mr. Chairman, what we have is a policy which has locked up large numbers of mostly young men for very long periods of time, and it has not worked very well. I know it is popular, and I have to say one of the things that is the oddest I have heard in this debate is Members who say, "Let's have the courage to reject the Sentencing Commission, let's have the courage to continue to lock these people up for many, many years." I cannot think of anything that takes less courage in America today than the perpetuation of this policy.

I think courage is, "Let's think about it." But we are not simply talking here about what I think is a mistaken policy of locking up nonviolent violators of the drug law for very long periods of time, as dumb and as wasteful as I think that is. That is a policy I cannot change right now.

We are talking about one particular aspect of this which says given that we are going to lock up these mostly young men who have done no violent crime against anybody and who have not been caught selling anything, because then they would be charged differently, but who are holding, what, almost a quarter of an ounce or a half an ounce, that we will treat them very harshly, but we will do it in a way which, and let us be very clear, no one has called into question the premise here. The sentencing disparity is overwhelmingly objectively a racist one.

Now maybe my colleagues think it is justified, but no one has denied that the effect of the policy is to treat young black men much more harshly for the possession of a given quantity of this substance of cocaine in this form than others. I can think of no policy which we have which in fact ends up so racially distorted, and I have to say I have had people on the other side say, "Well, it is because we care about these communities."

Mr. Chairman, I am one who believes that elections are meaningful in this country. I am skeptical when I hear large numbers of voters complain about the actions of this Congress because they sent us here. No one parachuted into this dome, no one got appointed here, and I believe that people on the whole elect people who represent them.

So when, and I have to say this to the overwhelming white majority of which I am a part in this House, when our African-American colleagues come here in large numbers and plead with us to allow a nonpartisan body of experts to change this racially disparate policy, it is a march to this floor of our African-American colleagues who are pleading with us to alleviate the most racially unfair policy in America, and, please, even if my colleagues disagree, do not tell them, "Oh, this is in the interest of your community, this is what the people you represent really want." I believe that we do not stay in this place very long if we do not reflect the people who sent us here, and when we have this extraordinary expression from the wide spectrum of opinion we often get within the Congressional

28

Black Caucus saying we are doing a terrible disservice to this
Nation and to these young people when we perpetuate this racially
disparate situation, then it seems to me people ought to listen.

We have talked about the racial problems reflected in the verdict of
O.J. Simpson. Many Members here, and let us be honest, many
Members here were disappointed that a march led by Louis
Farrakhan got such enthusiasm. I ask, " Why do you think it is
happening? Why do you have this great disparity?" It is partly
because of the kinds of policies we have here. Can we really be so
sure about maintaining this disparity in sentencing in the face of
the Sentencing Commission's argument, even if my colleagues
think that maybe they can make some technical justification
because of the chemistry of the powder versus the chemistry of the
crack? Is it worth perpetuating the anger, and the anguish, and the
sense of manifest unfairness that it brings? I do not see how anyone
in good faith can argue that we, as a Nation, are well served by
maintaining this.

Mr. Chairman, no one is talking about letting people walk. No one
is talking about letting people off the hook. We are asking for a
recognition of a very grave racial injustice.

Id. at H10,265-66 (Statement of Rep. Frank).

Mr. Chairman, I came to talk about Judge Lyle Strom. Judge Lyle
Strom was appointed by President Reagan. He is the chief judge of
the U.S. District Court in Nebraska, not a State known for a lot of
radicals. They look like they have great common sense out in
Nebraska, especially a Reagan appointee.

Well, let me tell you about Judge Lyle Strom. This brave judge has
stood up and become the first Federal judge to refuse to impose a
mandatory minimum sentence in a crack case, because he thought
it was totally unfair, as did the Sentencing Commission who has
studied this and is saying it is totally unfair.

Mr. Chairman, crack cocaine is minutes away from being powder
cocaine. What you are really doing by protecting powder cocaine,
which is what the other side is really doing, I think here today, is
that they are protecting the entrepreneurs. They take the powder
cocaine and cook it up and can sell it. Oh, well, we do not want to
get the big guys. We want to get the little guys at the end of the

29

line, and we have a disparity of 100 to 1. We are not talking a little disparity. It is a 100 to 1 disparity that we are talking about here when we look at the differences in the sentencing.

Now, Mr. Chairman, it seems to me that when you look at people like the judge who is head of the court in Nebraska, and when you look at the Sentencing Commission, which is not a radical bunch of people, they are saying to us that if we want this justice system to be considered fair and equal, and if we are going to sew up the holes in Miss Justice's blindfold so she is not peaking out to see whether this is a little entrepreneur that has powder and is going to make it into a lot of things, and who knows, it could be healthful later on, then we really need to act on what they are saying rather than throw what they are saying aside.

I really find it amazing that people are coming here and saying, oh, no, this is fair, this is fine, and then the gentleman from Massachusetts, Mr. Frank just pointed out that the other things that are being said on this floor are also untrue, and that is that if you really think you ought to raise powder cocaine up, then raise it up. Who is stopping you from doing it? However, every time that is tried, no, they have a reason for not doing that, either.

Mr. Chairman, it is absolutely no wonder that people think this is unfair, because it is unfair. Every objective soul that has really looked at this, including 8 of the 10 witnesses that appeared in front of the subcommittee and testified on this, and I tell you, it is the other side who called them, 8 of the 10 witnesses, when polled, disagreed with this bill. They were called to testify on this bill and they did not think that we should do this bill. They thought we should introduce fairness into our legal system. What a radical concept, that this 100 to 1 ratio was unfair, and that if we could not figure out that the root cause of crack cocaine was powder and we were going to insist on protecting powder possession, but going after crack possession, we really look like we got it all backward.

I would say that 8 out of 10, when they are called by the people trying to push the bill and could not get a better vote than that, is enough to say we all ought to sit up and take notice and we ought to listen to the many, many fair and objective people who have studied this and say we should move forward. Otherwise, we are never, never going to be able to look African-Americans in this country in the eye and say we are treating them fairly, because we

30

are not, and we better deal with it. Mr. Chairman, if my colleagues vote for this bill tonight, they are not treating them fairly, and they are allowing this injustice to continue.

Id. at H10,267-68 (Statement of Rep. Schroeder).

Ninety-five percent of those convicted for crack offenses are black and Hispanic. Seventy-five percent of those convicted of powder offenses are white. The Commission decided to equalize the base sentence with enhancement. Some say that crack dealers ought to get more because of the nature of the distribution. The enhancements will take that into consideration. Because you will get more time if you have a firearm, violence or death, juveniles, prior prison records, near schools, leadership role in the enterprise, other crimes, the sentencing will be based on the crime and based on an objective determination, not because the group happens to be 95 percent black.

Id. at H10,268 (Statement of Rep. Scott).

Mr. Chairman, the time has come for the Congress to have the courage to do the right thing, end this racist and unfair targeting of African-Americans for punishment.

Id. at H10,272 (statement of Rep. Stokes).

I come from an almost all white State and I know that the people of Vermont want tough law enforcement and tough penalties against drug dealers. But they do not believe that a white cocaine user should be treated far more leniently than a black cocaine user. And that is what the issue is here today. The criminal justice system must be fair and unbiased or it is simply not just.

Id. at H10,273 (statement of Rep. Sanders).

Mr. Chairman, I appreciate what the gentleman from Georgia just said, but when you go into white houses and white neighborhoods, they want white dealers put away, that sell it to white people. But they do not say put them away for a longer period of time than black people, or put black people away for a longer period of time than white people. It is a crime problem.

You know what cocaine does in the suburbs? People shoot people in the suburbs. They beat their children. They beat their spouses.

31

They screw up their businesses. They leave home. They have dissolutions of families, of marriages and children are left and are wards of the State.

It is the same drug. It is the same scourge on communities. The suggestion that somehow because black people believe in law enforcement and do not like people selling drugs in the streets that means they are for the unequal treatment of people is crazy, is absolutely crazy. We ought to deal with this as it is.

You have a little luxury because you come through parts of my district and pick it up in your BMW and go to a home where a cop would not go unless you called them and you get the luxury of using it and dealing it, you get a different penalty.

Id. at 10,269 (Statement of Rep. Miller).

Those who supported the legislation to maintain the 100:1 ratio also justified their

support on the basis of racial classifications.

I would just close by saying to the gentleman that the inner city neighborhoods, the poor minority neighborhoods, are the most fragile in the entire country.  They are the ones that have to be protected.  They are the ones where we have to rid the neighborhood of drug dealers.

Id. at H10,261 (Statement of Rep. Shaw).

The real world, Mr. Chairman, is a world that I have visited, have worked in and talked with people in when I had the honor of serving as the United States attorney for the Northern District of Georgia. . . .   In many of those visits, Mr. Chairman, I had the opportunity to talk with men and women and mothers and fathers in housing projects, many of them in Atlanta where we have some of the oldest and poorest housing projects in the country, many of them populated not exclusively but in terms of the number of people predominantly by black families, and in talking with those mothers and those fathers and those children and those brothers and sisters, they do not share the belief of our colleagues on the other side.

They told me then, they tell us now, they tell law enforcement officers

32

now, I do not care whether that person is black or white who is dealing
death in the form of crack cocaine, I do not care whether that person who
murders people either deliberately or inadvertently by drive-by shootings
because they are high on crack cocaine or because they think that person
may have snitched on them, they want those people off the streets. They
want them off the streets and they deserve to have this Congress heed that
cry and not be diverted, not be drawn off target by specious arguments,
absolutely specious arguments that we are hearing from the other side that
simply because we want to punish very strongly, very strictly and
hopefully very swiftly people that deal in a very, very addictive, very
dangerous mind-altering drug such as crack cocaine, that we think because
much smaller quantities can result and are used in fact for trafficking and
distribution than larger quantities of powdered cocaine, that those people
ought to be punished more because it is those people who are going into
the housing projects where our black youth are being killed and those
mothers particularly tell me. They told me this when I was United States
attorney, they tell me now as a Representative in the United States
Congress, " Get those people off the streets and put them away for a long
period of time."

Id. at H10,269 (Statement of Rep. Barr).

Thus, the crucial factors that the defendants in Johnson could not show are now clearly

established.  The cocaine sentencing scheme was "reaffirmed ... at least in part" because of its

adverse impact on African-Americans.  Johnson, 40 F.3d at 439.  In fact, it appears to be

primarily because of its adverse impact that the policy was reaffirmed, not just in part.  In

addition, unlike the 1986 Congress discussed in Johnson, African-American members in the

1995 Congress unanimously "attack[ed] promptly" and vehemently the sentencing disparities and

the Disapproval Act as racist and unwarranted.  As Judge Calabresi stated in United States v.

Then, 56 F.3d 464, 468 (2d Cir. 1995)(concurring opinion):

All this might change the constitutional status of the current
ratio.  If Congress, for example, though it was made aware of both
the dramatically disparate impact among minority groups of
enhanced crack penalties and of the limited evidence supporting
such enhanced penalties, were nevertheless to act affirmatively and

33

negate the Commission's proposed amendments to the Sentencing
Guidelines (or perhaps were even just to allow the 100-to-1 ratio to
persist in mandatory minimum sentences), subsequent equal
protection challenges based on claims of discriminatory purpose
might well lie. And such challenges would not be precluded by
prior holdings that Congress and the Sentencing Commission had
not originally acted with discriminatory intent. As the Supreme
Court has pointed out, facially-neutral legislation violates equal
protection if there is evidence that the legislature has "selected *or*
*reaffirmed* a particular course of action at least in part 'because of,
not merely 'in spite of,' its adverse effects upon an identifiable
group." Personnel Administrator of Massachusetts v. Feeney, 442
U.S. 256, 279, 99 S.Ct. 2292, 2296, 60 L.Ed. 2d 870
(1979)(emphasis added.)

Two other judges have also expressed reservations about the constitutional viability of the

crack/powder disparity. Judge Nathaniel R. Jones wrote eloquently of the discredited bases for

the disparity in United States v. Smith, 73 F.3d 1414, 1418 (6th Cir. 1996) (Jones, J., concurring).

He believed that:

> The current enforcement and sentencing policies may in fact be substantial
> factors in the persistence of the "crack epidemic" in the African-American
> community. These policies have resulted in the incarceration of scores of
> young black males, many of whom will remain in prison until they reach
> middle age.

Id. at 1422. Based on the 1995 Report, and other sources, Judge Jones concluded:

> Therefore, with the benefit of this further examination, I regard the
> premises which drive our constitutional analysis of the 100:1 ratio with
> great suspicion. Each of these premises is subject to challenge, and we
> must not ignore this fact. I urge my colleagues to don a more realistic set
> of lenses. Otherwise, we risk substantial harm to the integrity of our
> constitutional jurisprudence. Continued use of the law to perpetuate a
> result at variance with rationality and common sense – even in a war on
> drugs-is indefensible. We have seen instances of this being done in our
> nation's past that have come back to haunt us.

Id. (footnote omitted). Having reviewed the views of Judge Calabresi and Jones, Judge Cudahy

stated:

34

> Whether there could be a basis for the sort of argument suggested by Judge
> Calabresi is surely unclear.  But even without it, the extraordinary impact
> of the 100:1 ratio will provoke examination and reexamination however
> many efforts are made to lay the matter to rest.

United States v. Reddrick, 90 F.3d 1276, 1284 (7th Cir. 1996) (Cudahy, J., concurring).  In light

of the third report by the Commission discrediting the disparity, the continuation of it is

"indefensible," as Judge Jones perfectly stated it.

Exactly what Judge Calabresi described has come to pass.  The Commission has now

issued three reports throughly discrediting the purported rationales for the crack/powder

disparity.  The only Congressional action has been to disapprove the Commission's original

proposed amendment, and otherwise to do nothing.  Congress has reaffirmed the disparity in the

sentencing almost entirely for racial reasons.

The Disapproval Act was passed hurriedly, just days before the Commission's

amendment would take effect.  Even the majority in Congress recognized the error of its ways in

the gross disparities in the treatment of cocaine offenses.  Section 2(a)(2) of the Disapproval Act

required the Commission to

> propose revision of the drug quantity ratio of crack cocaine to
> powder cocaine under the relevant statutes and guidelines in a
> manner consistent with the ratios set for other drugs and consistent
> with the objectives set forth in section 3553(a) of title 28 of the
> United States Code.

As discussed above, the Commission did so, and again, in the 1997 Report, concluded that the

present crack/powder disparity is unwarranted.

Further, the congressional majority did not even attempt to justify the 100:1 penalty

differential.  The House Report accompanying the bill concedes the inequity in the

35

harsher penalties for crack cocaine.

> It should be noted that the current 100-to-1 quantity ratio may not
> be the appropriate ratio. The goal must ultimately be to ensure that
> the uniquely harmful nature of crack is reflected in sentencing
> policy and, at the same time, uphold basic principles of equity in
> the U.S. Code.

House Report at 16.

This discrimination is particularly acute in this district. In the Sentencing Commission's

Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice

System (1991), the commission tabulated by circuit the percentage of defendants sentenced at or

above the mandatory minimum sentence. The D.C. Circuit had the highest percentage (80%) of

any circuit, by more than five percent. Id. at 62. The Commission found:

> The disparate application of minimum sentences in cases in which
> available data strongly suggest that a mandatory minimum is
> applicable appears to be related to the race of the defendant, where
> whites are more likely than non-whites to be sentenced below the
> applicable mandatory minimum; and to the circuit in which the
> defendant happens to be sentenced, where defendants sentenced in
> some circuits are more likely to be sentenced below the applicable
> mandatory minimums than defendants sentenced in other circuits.
> This differential application on the basis of race and circuit reflects
> the very kind of disparity and discrimination the Sentencing
> Reform Act, through a system of guidelines, was designed to
> reduce.

Id. at ii. Thus, Congress was also aware that there was unwarranted disparity based on race with

respect to mandatory minimum sentences as well. Furthermore, form 1992 to 2000, the

percentage difference between average sentence for powder and crack cocaine has been steadily

increasing. In 1992, the average sentence for crack offenses was 24.8% higher than for powder

offenses, while in 2000 the differential had climbed to 55.8%. U.S. Sentencing Commission:

36

1992-2000 datasets, USSC FY92-USSC FY00. The average crack sentence in 2000 was 120 months, more than 50 per cent more than the average powder sentence of 77 months. 2002 Report at 34.

The invidious discrimination in the cocaine sentencing scheme becomes all the more evident when looking at changes made by the Commission in covering guidelines involving drugs where the majority of offenders are white. The Commission has lowered offense levels for LSD (Amendment 488) and marijuana (Amendment 516). Congress left these reductions undisturbed. The crack/powder amendment is the only drug amendment Congress has ever disapproved. Because Congress, knowing the disparate racial impact and lack of policy bases to justify the penalty differential, "reaffirmed ... at least in part" the enhanced penalties for crack cocaine because of its adverse impact on African-Americans, Johnson, 40 F.3d at 439, the existing penalty scheme is invalid it on equal protection and due process grounds. As the Supreme Court also stated in Johnson v. California, it has made "unceasing efforts to eradicate racial prejudice from our criminal justice system." 2005 WL 415281 at *8.

### 6.    The Smith Case

Consistent with Booker and the above discussion, a district court very recently imposed a sentence below the recommended guidelines because of the unwarranted disparity between crack and powder. In United States v. Smith, 2005 WL 549057 (E.D. Wis. March 3, 2005), Judge Lynn Adelman of the Eastern District of Wisconsin dealt with a defendant facing a ten-year mandatory minimum sentence, whose guidelines range was 121-151 months, as a result of an offense level of 31 and a criminal history category of II. The government, however, moved for a 6-level departure under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e). This would have resulted in

37

a guidelines range of 70-87 months, but, because the

§ 3553(e) motion did away with the mandatory minimum sentence, the "extent of any departure

granted is within the court's discretion."  Initially, Judge Adelman granted a 10-level departure

for the substantial assistance.

Judge Adelman then thoroughly reviewed the Commissions's three reports, as well as

other literature on the crack/powder disparity.  She noted that the "Commission has studied the

issue in depth and concluded that the assumptions underlying the disparity between crack and

powder are unsupported by data."  She concluded, as had the Commission, that "none of the

previously offered reasons for the 100:1 ratio withstand scrutiny."  She reviewed the

Commission's efforts to eliminate the unwarranted disparity:

> In the present case, I concluded that adherence to the guidelines would
> result in a sentence greater than necessary and would also create
> unwarranted disparity between defendants convicted of possessing powder
> cocaine and defendants convicted of possessing crack cocaine.  The
> question then became what ratio to apply.  Everyone seems to agree that
> 100:1 is too high.

In Smith, the drugs were found in defendant's home.  There were 69.99 grams of crack

and 653.19 grams of powder.  The district court converted this to 1528 kilograms of marijuana,

in accordance with the drug equivalency table in § 2D1.1 comment. (n.10).  The crack converted

to 1399.80 kilograms of marijuana, and the powder to 130.63 kilograms.  Thus, the powder,

which was almost ten times the quantity of crack, had no affect on the offense level.  The

resulting offense level was 32.  There were also two loaded handguns in a dresser, which

increased the offense level by 2 under § 2D1.1(b)(1).  With a three-level decrease for acceptance

of responsibility, the adjusted offense level was 31.

38

The defendant in <u>Smith</u> also had two prior convictions, both for possessing marijuana. He received "short jail terms" for the prior convictions. This put him in criminal history category II. The resulting guidelines range was 121-151 months.

Judge Adelman ultimately decided to apply the roughly 20:1 ratio that would have resulted from the 2002 Report's recommendations and proposed guidelines restructuring. This resulted in a guidelines range of 27-33 months. Under all the circumstances, she imposed a sentence of 18 months.

### 7.    <u>The Present Case</u>

It is important to note that reducing defendant's sentence for the unwarranted disparity in crack/powder sentencing is not a "departure" from the guidelines, whatever that term may mean in an advisory system. The guidelines are, under <u>Booker</u>, only one factor among several to be considered in imposing a sentence. Attempting to remedy the unwarranted disparity well serves the statutory command to "impose a sentence sufficient, but not greater than necessary" to "promote respect for the law," to "provide just punishment," to "reflect the seriousness of the offense," to account for "the nature and circumstances of the offense," and to "avoid unwarranted sentence disparities." Indeed, Judge Adelman referred to some of these purposes in deciding the sentence to be imposed in <u>Smith</u>.

In the present case, the Defendant was arrested with slightly more than 81 grams of cocaine base, resulting in an offense level of 30. Defendants convicted of possessing 81 grams of powder cocaine have an offense level of 16 – *fourteen* levels less than defendants convicted of having 81 grams of cocaine base. At best, Ms. Wasi's conduct is akin to a street-level seller and not a "high-level" drug trafficker. Indeed the instant case fits squarely within the Commission's

concerns regarding the unfair and unwarranted crack sentencing disparity.

> Powder cocaine is easily converted into crack cocaine through a simple process involving baking soda and a kitchen stove. Conversion usually is done at the lowest levels of the drug distribution system. Large percentages of the persons subject to five-and ten-year penalties under the current rules do not fit the category of serious or high-level trafficker that Congress described when initially establishing the five-and ten-year penalty levels.

Assessment at 132. Defendant therefore is not the "serious or high-level trafficker" that should receive such a high, and unfair, sentence.

**B.    Criminal History Computation**

The Probation Department has determined that Ms. Wasi' Criminal History Category is I. Ms. Wasi does not dispute this calculation.

**C.    Imposition of Sentence Under 18 U.S.S.C. §3553**

As noted above, pursuant to 18 U.S.C. §§ 3562 and 3553(a) sentencing courts should consider the need for the sentence imposed 1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; 2) to afford adequate deterrence to criminal conduct; 3) to protect the public from further crimes of the defendant; and 4) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged. Specifically, courts should "impose a sentence sufficient, but not greater than necessary,

to comply with the purposes" set forth above.

1. **Nature of the Offense**

Although no drug trafficking offense can or should be deemed minor, congress has directed that defendants convicted of possessing more than 5 but less than 50 grams of cocaine base be sentenced to as little five years in prison and no more than 40 years in prison. Moreover, if a defendant qualifies for the "safety valve" exception found in 18 U.S.C. §3553 and U.S.SG. §5C1.2, she may be sentenced to as little as 37 months in prison.

Although Ms. Wasi does not qualify for the safety valve exception, the Probation Department has concluded that Ms. Wasi' role in the offense  was minor. Moreover, there is no evidence Ms. Wasi was actively involved in Mr. Wooten's drug trafficking activity. Indeed, absent her involvement with Mr. Wooten – the physically and emotional abusive father of her child, there is no evidence Ms. Wasi has ever engaged in the sale or distribution of narcotics.

2. **Character of the Defendant**

Ms. Wasi is 29 years old. As documented in the Pre-Sentence Report, Ms. Wasi endured an unusually horrific and volatile childhood. Not surprisingly, this led to severe substance abuse which went untreated. At the time of her arrest, she weighed less than 100 pounds.

As the Court knows, Ms. Wasi has been detained at The Correctional Treatment Facility for the last two years. During that time, Ms. Wasi has gained the trust and admiration of the staff, who describe Ms. Wasi as a "model inmate" that has earned the lowest custody level classification. Her Unit Manager describes Ms. Wasi as "dedicated and reliable." Her Aramak Food Services Detail supervisor notes Ms. Wasi "possesses good work ethics and there is always positive feedback on her performance." And just last Friday, Ms. Wasi received her GED. Finally, she now enjoys excellent

health.

     3. **Needs of the Public**

This case carries a mandatory minimum sentence of five years. 18 U.S.C. §3553 directs the Court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth in the statute. A sixty months sentence far exceeds the Defendant's proposed sentencing guideline range of 12-18 months. The needs of the public are amply served with a 60 month sentence in this case.

**E. Conclusion**

For the forgoing reasons, I urge the Court to sentence Ms. Wasi to the mandatory minimum sentence in this case of 60 months in prison. This sentence is "sufficient, but not greater than necessary, to comply with the purposes" set forth in 18 U.S.C. §3553.

     Respectfully submitted,

     A.J. KRAMER
     FEDERAL PUBLIC DEFENDER


_____
     David W. Bos
     Assistant Federal Public Defender
     625 Indiana Avenue, N.W., Suite 550
     Washington, DC 20004
     (202) 208-7500

## <u>CERTIFICATE OF SERVICE</u>

I, David W. Bos, Assistant Federal Public Defender, hereby certify that I have served a copy of the attached Sentencing Memorandum upon Jeffery Pearlman, Esquire, Assistant United States Attorney.

_____
David W. Bos
Assistant Federal Public Defender

**DATE:**